Filed 7/1/13  P. v. Moses CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C068289 |
| Plaintiff and Respondent, | (Super. Ct. No. 093273) |
| v. | |
| BENNIE DALE MOSES, JR., | |
| Defendant and Appellant. | |

Convicted of 62 sex crimes against his daughter and sentenced to the better part of a millennium in prison, defendant Bennie Dale Moses, Jr., appeals contending:  (1) the trial court erred in denying his new trial motion without holding an evidentiary hearing; (2) none of the convictions for forcible sex crimes are supported by substantial evidence; (3) the prosecution of eight charges of unlawful sexual intercourse with a minor (i.e., statutory rape) was barred by the statute of limitations; and (4) two restitution fines must be reduced from $12,400 to $10,000 each.  Defendant also asks us to review the transcript of an in camera *Pitchess*[1] hearing for abuse of discretion.

---

[1]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

On review, we find no error in the denial of the new trial motion and no abuse of discretion in the *Pitchess* hearing; however, we conclude that all of defendant's convictions for forcible sex crimes based on acts that occurred before the victim was 18 must be reversed for lack of substantial evidence of duress. We also conclude that the eight charges of unlawful sexual intercourse with a minor must be dismissed because prosecution of those charges was barred by the statute of limitations. Finally, we agree that the two restitution fines must be reduced to $10,000 each. Accordingly, we will reverse some of defendant's convictions, dismiss some of the charges, affirm the remainder of his convictions, and remand for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

The victim was born in May 1988. She began living with defendant when she was nine years old. Before that, she lived with her paternal grandmother.

Defendant first had sexual intercourse with the victim when she was 12 years old. He had sex with her once or twice, then stopped when they moved in with his girlfriend for a few months around the time the victim turned 13. After they moved back out on their own, however, defendant began having sex with her almost every day. By the time the victim was 15, defendant was also having oral sex with her on a weekly basis.

When the victim was 17, a woman whom defendant later married (Amber), moved in with them. At that time, defendant stopped having sex with the victim regularly, but they did have sex sometimes when Amber was gone. This occurred more than twice a year.

In June 2009, when the victim was 21 years old, she and defendant moved into a motel in West Sacramento. Defendant was still married to Amber, but Amber was living elsewhere. While they were staying at the motel, defendant had sexual intercourse with the victim every night and had oral sex with her once or twice.

In July 2009, the victim told a friend (Hakeem) that defendant was making her have sex with him. Hakeem arranged to meet her after work, and when she went to meet

him, the police were there. The victim confirmed to the police what she had told Hakeem.

Defendant was charged with 69 sex crimes against the victim between the victim's 12th birthday (in May 2000) and July 2009. Included were numerous charges of aggravated sexual assault (i.e., forcible rape) of a child, forcible rape, and forcible oral copulation. (We will refer to these crimes jointly as the forcible sex crimes or charges.) Also included were eight charges of unlawful sexual intercourse with a minor (i.e., statutory rape). The information also included sentencing allegations under the three strikes law based on 12 prior serious felony convictions.

The People's theory at trial in support of the forcible sex charges was that defendant accomplished all of the sex acts with the victim by means of duress, "because it started when [the victim] was 12 years old and she didn't know any better. And . . . because it was her dad [who] was making her do it."[2]

At trial, the prosecution offered testimony from West Sacramento Police Officer Daniel Bowers that he took defendant to the hospital for a sexual assault kit. Officer Bowers testified that while they were together, defendant told the officer that he (defendant) "should have said no" to having sex with the victim. The prosecution also

---

**2**  With the exception of nine counts of forcible oral copulation, each of the 39 forcible sex crimes charged here was paired with a corresponding nonforcible sex crime. Thus, the four charges of aggravated sexual assault of a child were paired with four charges of lewd and lascivious conduct; the 18 charges of rape were paired with eight charges of unlawful sexual intercourse with a minor and 10 charges of incest; and eight of the charges of forcible oral copulation were paired with eight charges of oral copulation of a minor. Accordingly, there was a forcible sex charge to cover each of 39 separate instances in which defendant allegedly had either sexual intercourse or oral sex with the victim, and in 30 of those 39 instances there was a corresponding nonforcible sex charge. In this manner, the prosecution presented the case that "[a]ll of the vaginal and oral sex that the defendant accomplished in this case was accomplished by the use of duress."

offered into evidence a video recording of a police interview with defendant in which he admitted having sex with the victim when "[s]he was grown."

The jury found defendant not guilty of five charges and failed to reach a verdict on two others, but found him guilty of the remaining 62 charges, including 35 forcible sex charges and all eight counts of unlawful sexual intercourse with a minor. The trial court found the three strikes sentencing allegations true and sentenced defendant to prison for an aggregate determinate term of 220 years and an aggregate indeterminate term of 610 years to life. The court also imposed a restitution fine of $12,400 and a parole violation fine in the same amount.

Defendant timely appealed.

## DISCUSSION

## I

### *Pitchess*

Before trial, defendant filed a *Pitchess* motion for discovery of information pertaining to Officer Bowers. After conducting an in camera hearing, the trial court found there were "no discoverable materials" in the police department's personnel records pertaining to Officer Bowers and consequently denied the motion.

On appeal, defendant asks this court to review the sealed transcript of the in camera hearing and "determine whether the superior court abused its discretion in refusing to disclose pertinent information in the officer's personnel files." Having reviewed the transcript, we find no abuse of discretion.

## II

### *New Trial Motion*

After the verdicts were read and recorded, defense counsel spoke with some of the jurors outside the courtroom. According to counsel, one of the jurors told her that she (the juror) had asked her husband whether he would ever admit to sleeping with his daughter if he had not done so, and her husband told her he "would never say he had slept

4

with his daughter if it wasn't true." Another attorney in the public defender's office corroborated that the juror made this statement.

Defendant subsequently moved for a new trial on the ground of jury misconduct. In support of that motion, defense counsel and her colleague submitted declarations attesting to what the juror had said; no declaration from the juror herself was offered.

The People opposed the new trial motion, arguing that "[a]ny juror misconduct in this case was not prejudicial" "[g]iven the strength of the People's case presented at trial and the minor impact any misconduct may have had on the verdict."

At the hearing on the motion, defense counsel argued that there was "a presumption of prejudice here and . . . the Court would need to have a hearing and have the jurors come in to show that, in fact, there wasn't any prejudice, it didn't affect the deliberation."

The trial court initially noted that "[p]rocedurally the two declarations contain hearsay information" and "[t]he California Supreme Court has said that hearsay information does not constitute competent evidence of juror misconduct." Without denying the motion on that basis, however, the court observed that the "kind of conversation [on which the motion was based] held outside the jury room with someone who was not a juror constitutes misconduct." Moving to the issue of prejudice, the court explained that while the evidence of defendant's guilt was "extremely strong," the court could not "agree with the People that a finding that the strength of the People's case is very strong . . . in and of itself rebut[s] the presumption of prejudice." The court then went on to consider "whether the information provided to the juror was inherently and substantially likely to have resulted in undue juror influence," deciding that "the conclusion that someone would not confess to raping his daughter; that is, breaking that taboo unless it were actually true is really an obvious and common sense conclusion when one looks at the taboo itself. [¶] It doesn't require any special expertise to come to that conclusion. It is, in fact, the kind of common experience of life normally used by

5

jurors in coming to the verdicts that we ask them to address. [¶] So I conclude then that there is, in fact, no substantial likelihood that the conversation between [the juror] and her husband undermined or prejudiced the jury's verdict in this particular case, and for those reasons I would deny the defendant's request for a new trial."

On appeal, defendant contends the trial court erred in denying his new trial motion without conducting an evidentiary hearing. He first contends that "since the court was not satisfied that the declarations provided competent evidence of misconduct, . . . the proper next step was to set a hearing and to hear the testimony of the jurors in order to establish whether the claimed conversation between the juror and her husband actually occurred," among other things. As we have explained, however, the court did not deny the new trial motion on the basis that it was supported only by hearsay evidence. Instead, the court decided there was no substantial likelihood that the claimed misconduct prejudiced defendant.

Defendant suggests that it was nonetheless an abuse of discretion for the trial court to refuse to conduct an evidentiary hearing "to determine the precise nature and true impact of the misconduct." We disagree.

"The trial court has the discretion to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. [Citation.] Defendant is not, however, entitled to an evidentiary hearing as a matter of right. Such a hearing should be held only when the court concludes an evidentiary hearing is 'necessary to resolve material, disputed issues of fact.' [Citation.] 'The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' " (*People v. Avila* (2006) 38 Cal.4th 491, 604.)

6

Defendant does not identify any such material conflict here. He argues that "the trial court erred in ruling on the motion for a new trial without first conducting a hearing *to determine the degree to which this admitted act of misconduct may have infected the jury's verdicts*." (Italics added.) But he fails to explain *how* this could have been determined at an evidentiary hearing.

Subdivision (a) of Evidence Code section 1150 provides that "[u]pon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly," but "[n]o evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." In light of this prohibition, accepting the declarations from defense counsel and her colleague as true (as the trial court did in determining the claimed misconduct was not prejudicial), the only further pertinent information that might have been elicited at an evidentiary hearing is whether the juror related her conversation with her husband to any of the other jurors during deliberations. Even then, however, the trial court's decision on the issue of prejudice would have been the same. This is so because the court concluded that the answer provided by the juror's husband was "really an obvious and common sense conclusion" that "is, in fact, the kind of common experience of life normally used by jurors in coming to the verdicts that we ask them to address." Thus, even if the juror shared her husband's answer with the other jurors, that fact would not have made a difference in the trial court's assessment of whether the misconduct was prejudicial to defendant.

Given that defendant fails to offer any persuasive argument as to how an evidentiary hearing could have helped him in light of the limitations of Evidence Code section 1150 and the trial court's determination of why the misconduct was not

7

prejudicial, we conclude that he has shown no abuse of discretion in the trial court's denial of his new trial motion without an evidentiary hearing.

### III

### *Sufficiency Of The Evidence*

Defendant contends "the counts involving . . . duress should be reversed due to insufficiency of the evidence." With the exception of the 18 convictions based on acts that occurred on or after the victim's 18th birthday, we agree.

We begin our analysis with the definition of duress. For purposes of the crime of forcible oral copulation (§ 288a, subd. (c)(2)), duress means " 'a direct or implied threat of force, violence, danger, *hardship* or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1004, quoting *People v. Pitmon* (1985) 170 Cal.App.3d 38, 50; see *id.* at p. 51 [noting that the *Pitmon* definition of duress has been applied to the crime of forcible oral copulation].) The meaning of duress is essentially the same for the crimes of rape (§ 261) and aggravated sexual assault of a child (§ 269, subd. (a)(1)), except that a threat of hardship does not qualify as duress for purposes of these crimes.[3] (See § 261, subd. (b).) "The total circumstances, including

---

[3] In *Leal*, citing *People v. Cochran* (2002) 103 Cal.App.4th 8, 13, our Supreme Court noted that "[t]he *Pitmon* definition . . . has been used to define the term 'duress' as it is used in the sexual offense[] of aggravated sexual assault of a child in violation of section 269." (*People v. Leal*, *supra*, 33 Cal.4th at p. 1005.) In *Cochran*, however, different subdivisions of section 269 were at issue than the subdivision at issue here. (See *Cochran*, at p. 13 [citing subdivisions (a)(3) and (4) of section 269].) Here, defendant was charged with the aspect of section 269 that covers the forcible rape of a child under the age of 14 who is seven or more years younger than the perpetrator, which is subdivision (a)(1) of section 269. That subdivision specifically refers to "[r]ape, in violation of paragraph (2) or (6) of subdivision (a) of Section 261." Subdivision (a)(2) of section 261 includes rape by means of duress. Thus, when (as here) a charge of

8

the age of the victim, and [her] relationship to defendant are factors to be considered in appraising the existence of duress." (*Pitmon*, at p. 51.)

Defendant contends "the rationale behind the prosecution's theory was that duress was inherent because [the victim] was young and [defendant] was her father, but these factors do not, and should not, automatically equate to duress." In response, the People contend the jury's implicit findings of duress are supported by "[the victim's] young age, complete dependence on [defendant], her father, and [defendant]'s violent behavior towards [the victim]."

We agree with defendant that, without more, the victim's age and her relationship to defendant were not enough to support a finding that defendant accomplished any of the sexual acts with the victim by means of duress. As we have noted, duress requires a direct or implied threat. Even when the threat is implied, it must be implied by something the perpetrator says or does. (Cf. *People v. Soto* (2011) 51 Cal.4th 229, 246 [noting that "the legal definition of duress is objective in nature" and "the focus must be on the defendant's wrongful act, not the victim's response to it"].) Thus, the victim's age and her relationship to the perpetrator will not, by themselves, support a finding of duress.

Having said that, we nevertheless agree with the People's assertion that there was something more here on which the jury could have reasonably premised a finding of duress. But we disagree with the People that this additional factor supports *all* of the forcible sex crimes of which defendant was convicted.

In support of the jury's implicit findings of duress, the People argue that "evidence supported the fact that [the victim] was afraid of [defendant]. . . . [Defendant] would slap

aggravated sexual assault of a child is made under subdivision (a)(1) of section 269 based on the theory that the rape of the child was accomplished by means of duress, the definition of duress that applies is necessarily the one from the rape statute, which excludes a threat of hardship.

9

[the victim] when he found out she was with other people and would threaten to kill her if she told anyone about him having sex with her. . . . [Defendant] set a rule that [the victim] could not have a boyfriend. . . . When [defendant] found out that [the victim] had a boyfriend he would get angry and make her break it off. . . . [Defendant] would threaten [the victim] that he would 'knock the crap out of her' and that he would throw her off the balcony if she ever brought a male to the motel."

The victim's fear of defendant will not support a finding of duress unless there was also evidence that defendant did something to cause that fear. In *People v. Espinoza* (2002) 95 Cal.App.4th 1287, the court explained that "[w]hile it was clear that [the victim] was afraid of defendant, no evidence was introduced to show that this fear was based on anything defendant had done other than to continue to molest her. It would be circular reasoning to find that her fear of molestation established that the molestation was accomplished by duress based on an implied threat of molestation." (*Id.* at p. 1321.) *Espinoza* illustrates the fact that fear alone does not establish duress; the fear must be based on something the defendant does or says, i.e., an express or implied threat by the defendant.

As for the victim's testimony that it was "against the rules for [her] to have a boyfriend," the People fail to explain how that has any bearing on the issue of duress. The victim did testify that defendant "would be angry" if he thought she had a boyfriend, and in an interview with police she said he hit her once when she did not go to work and instead was "seeing this guy." She also told police that "he threatened that if [she] ever had anyone, any male at the motel, he'd throw [her] over the balcony." At no point, however, did the victim ever tie defendant's reaction to her having a boyfriend to the sexual acts in which she and defendant engaged. Thus, defendant's anger, threats, and (at least in one instance) physical violence against the victim related to her having boyfriends cannot support the jury's implicit findings of duress.

10

There was testimony, however, that does support at least *some* of the forcible sex crimes of which defendant was convicted. Specifically, the victim testified that defendant told her "not to tell anyone, because he would go to jail. And if he went to jail, then he would kill [her]." Such a direct threat of physical violence is sufficient to support a finding of duress. (See *People v. Cochran*, *supra*, 103 Cal.App.4th at p. 15 ["A threat to a child of adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress, particularly if the child is young and the defendant is her parent"].) The only problem with this evidence is one the People ignore. When asked how old she was when defendant threatened to kill her if she told, the victim responded, "I think, like, 17 or 18." When asked if defendant told her "anything like that when [she was] younger," the victim responded, "No."

Based on the victim's uncertainty as to when defendant threatened to kill her if she told, the most that can reasonably be drawn from this evidence is that the threat was made by the time the victim was 18 years old. Thus, the victim's testimony provides substantial evidence from which the jury could have reasonably found that defendant used duress to commit the forcible sex crimes that occurred on or after her 18th birthday. But this testimony does not constitute substantial evidence of duress with respect to any of the earlier forcible sex crimes because there is no substantial evidence to show that the threat was made before any of those earlier crimes.

Based on the foregoing, we conclude the evidence was sufficient to support the forcible sex crime convictions for acts that occurred on or after the victim's 18th birthday (counts 41, 43, 44, 46, 47, 49, 50, 52, 53, 55, 56, 58, 59, 61, 62, 65, 67, and 68), but the evidence was not sufficient to support the forcible sex crime convictions for acts that occurred before that date (counts 3, 5, 7, 9, 13, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35, 37, and 39). Accordingly, we will reverse defendant's convictions on the latter counts based on insufficient evidence and remand the case for resentencing.

11

IV

*Statute Of Limitations*

Defendant contends his eight convictions for unlawful sexual intercourse with a minor (counts 10, 14, 18, 22, 26, 30, 34, and 38) must be reversed because the prosecution of those charges was barred by the statute of limitations. The People agree.

At the outset, we note that defendant is entitled to raise this argument for the first time on appeal. (See *People v. Williams* (1999) 21 Cal.4th 335, 338 ["a defendant may not inadvertently forfeit the statute of limitations and be convicted of a time-barred charged offense"; "if the charging document indicates on its face that the charge is untimely, absent an express waiver, a defendant convicted of that charge may raise the statute of limitations at any time"].)

Penal Code section 801.1 extends the limitations period for many sex crimes committed against minors until the victim's 28th birthday or for a period of 10 years after the commission of the offense; however, Penal Code section 261.5 -- the statute that criminalizes unlawful sexual intercourse with a minor -- is not listed in section 801.1. Accordingly, the limitations period for prosecuting a violation of Penal Code section 261.5 is three years after commission of the offense. (See Pen. Code, §§ 261.5, 801.)

All eight of the unlawful sexual intercourse with a minor crimes here occurred before the victim's 18th birthday in May 2006. Because the earliest the prosecution commenced for purposes of the statute of limitations was July 23, 2009, when defendant was arraigned on the criminal complaint (see Pen. Code, § 804, subd. (c)), the prosecution of all those offenses was barred by the three-year statute of limitations. Accordingly, we will reverse defendant's eight convictions for unlawful sexual intercourse with a minor and dismiss those charges.

V

*Restitution Fines*

Defendant contends the trial court erred in ordering restitution fines of $12,400 each under Penal Code sections 1202.4 and 1202.45 because the maximum restitution fine that may be imposed under those statutes was $10,000. The People concede the error, and we accept the concession. Under subdivision (b)(1) of Penal Code section 1202.4, the restitution fine "shall be . . . not more than ten thousand dollars ($10,000)" if the person is convicted of a felony. Under Penal Code section 1202.45, the parole revocation restitution fine must be "in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." On remand for resentencing, the trial court must reduce both fines accordingly.

DISPOSITION

Defendant's convictions on counts 3, 5, 7, 9, 10, 13, 14, 17, 18, 19, 21, 22, 23, 25, 26, 27, 29, 30, 31, 33, 34, 35, 37, 38, and 39 are reversed, and counts 10, 14, 18, 22, 26, 30, 34, and 38 are dismissed. The remainder of defendant's convictions are affirmed, and the case is remanded to the trial court for resentencing. At resentencing, the court must reduce the restitution fines to an amount within the statutory maximum of $10,000.

      ROBIE    , Acting P. J.

I concur:

     BUTZ   , J.

13

MURRAY, J., Concurring and Dissenting.

I respectfully disagree with the majority's conclusion that there is insufficient evidence of duress before the victim's 18th birthday. Consequently, I dissent as to that part of the majority opinion, but otherwise concur.

## I. Standard of Review

We review insufficient evidence contentions under the substantial evidence standard. We "must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence--evidence that is reasonable, credible and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054 (*Kraft*).) Reversal on grounds of insufficiency of the evidence is "unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*), italics added.)

## II. Analysis

The definition of duress includes an implied threat of force *or* danger which would cause a reasonable person of ordinary susceptibilities to acquiesce in an act to which one otherwise would not have submitted. (*People v. Leal* (2004) 33 Cal.4th 999, 1004.) There need not be a direct threat. (*People v. Cochran* (2002) 103 Cal.App.4th 8, 14, disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12.) The totality of the circumstances must be considered in determining the existence of duress. (*People v. Pitmon* (1985) 170 Cal.App.3d 38, 51, disapproved on other grounds in *Soto*, *supra*, 51 Cal.4th at p. 248, fn. 12.) Appellate courts have identified a number of circumstances or factors to consider in determining whether there is sufficient evidence of duress, including but not limited to: (1) the age of the victim, (2) the age difference

1

between the defendant and the victim, (3) the size of the victim and the size of the defendant, (4) the victim's relationship to the defendant, and (5) the position of dominance and authority of the defendant. (*Cochran*, *supra*, 103 Cal.App.4th at pp. 13-14; *People v. Cardenas* (1994) 21 Cal.App.4th 927, 940; *Pitmon*, *supra,* 170 Cal.App.3d at p. 51.)

Here, the majority correctly notes that the victim's age and her relationship to the defendant, without more, are insufficient to establish duress. (Maj. opn., p. 9.) And the majority correctly notes that the victim's fear of defendant is not enough to establish duress. Defendant must do or say something to imply a threat of either force *or* danger. (Maj. opn., p. 10.) I agree, but what a defendant must do or say to imply a threat of either force *or* danger will vary depending on the circumstances. Here, defendant did and said plenty, beginning with the first episode -- an incident that set the tone for defendant's subsequent acts of sexual exploitation of his daughter. I conclude that a rational trier of fact could have found implied force *or* danger from the totality of the circumstances of the first act of sexual intercourse when the victim was 12 years old.

The totality of the circumstances that support the jury's finding of duress during the first act of sexual exploitation include: (1) the perpetrator was the victim's biological father; (2) the victim was only 12 years old; (3) only the victim and defendant lived in the residence where the sexual assault occurred -- thus, the victim was isolated and alone; (4) the evidence suggests no prior grooming of the victim or prior milder forms of molestation during the three years she lived with defendant -- thus, this act of sexual intercourse came completely out of the blue; (5) the victim knew her father had been incarcerated for most of her childhood up to age nine when she began to live with him, a fact from which a reasonable jury could infer the victim knew defendant was capable of doing bad things; (6) defendant took off the bottom portion of the victim's clothes prior

2

to the sexual assault; (7) defendant *physically got on top of the victim* to commit the act; and (8) this scared the 12-year-old victim.[1]

Thereafter, defendant continued to have sexual intercourse off and on with the victim up until his arrest in 2009, including the period of time she was between the ages of 13 and 17, when they were living alone and when, according to the victim, defendant had sexual intercourse with her nearly every day. Physically getting on top of the victim, combined with all of the other circumstances in play at the time of the initial sexual assault, is sufficient evidence of duress. And from the circumstances of the initial sexual assault alone, I conclude a reasonable jury could have inferred that duress flowed from and was present after that first act.

Moreover, aside from the initial act, from which it could be inferred that subsequent duress flowed, there was additional evidence that should be added to the duress calculus. The victim testified that when she was "younger," what defendant was doing made her feel "a little bit [bad]," and from that, she had a thought that what

---

[1] The following from the victim's police interview, which the jury heard, indicates that defendant's actions, including *getting on top of the victim*, scared her:

"[DETECTIVE TATE]: . . . And when that happened . . . that was from when you were 12 years old and I mean would he stay in your room all night or . . .

"[THE VICTIM]: No.

"[DETECTIVE TATE]: [S]o he would come in and he would start touching you and then what would happen?

"[THE VICTIM]: Mmm he just come *on top of me*, [*sic*] had sex with me, yeah.

"[DETECTIVE TATE]: Okay. Did you . . .

"[THE VICTIM]: I -- 'cause I didn't know, I was still young.

"[DETECTIVE TATE]: Right.

"[THE VICTIM]: I mean, *I just scared of him* [*sic*]." (Italics added.)

3

defendant was doing was wrong, but he told her what he was doing was not wrong. Although not expressly stated, a fair reading of the prosecutor's direct examination suggests that the word "younger" referred to the period of time before Amber married defendant.[2]

Beyond getting on top of the victim to commit the initial act of sexual intercourse, there is more evidence of *what defendant did* that must be added to the duress calculus. The victim testified defendant slapped her when she would upset him. This scared her. The victim testified that, on at least one occasion, defendant became upset and slapped her when he found out she was with other people.[3] Defendant got mad at her for talking to other males. Although the prosecutor did not expressly ask when this occurred, the victim testified that she had boyfriends when she was in high school, and her testimony suggests this time frame was included when defendant slapped her. Further, she testified that defendant did not hit her that often, "especially as she was older." And in her police interview she said, "[H]e just hasn't really . . . been hitting me as much as he did when I was like younger." From this, a reasonable jury could conclude that most of the hitting occurred when the victim was younger than on the day defendant's conduct came to light.

The majority acknowledges the victim's testimony about her violations of defendant's no-boyfriend rule, but says, "[a]t no point . . . did the victim ever tie defendant's reaction to her having a boyfriend to the sexual acts in which she and defendant engaged. Thus, defendant's anger, threats, and (at least in one instance) physical violence against the victim related to her having boyfriends cannot support the jury's implicit findings of duress." (Maj. opn., p 10.)

---

[2] The victim was 18 years old when defendant married Amber.

[3] It is a fair inference that this happened more than once, because the victim used the plural "people" instead of another person to describe when this happened.

4

I disagree that the victim had to expressly make the connection the majority requires before this evidence could be considered by a reasonable jury in the duress calculus. Determining whether there was a "tie" between defendant's conduct and the creation of duress was the jury's job, and a jury could infer, given the totality of the circumstances, that defendant's demands were not fatherly parenting, but rather inspired by his desire to sexually dominate the victim. Given defendant's ongoing sexual exploitation of the victim and an apparent desire to maintain the sexual arrangement he created for himself, such an inference is quite reasonable. In short, the "tie" the majority finds lacking is made by the circumstances and it is reasonable to infer that the victim recognized the connection.

There is more. Occasionally, defendant would get mad at the victim and yell or throw things. The victim testified she was afraid of defendant. She also testified that she found it easier "just to go along with" defendant.

There is more still. Defendant would also get mad at the victim if she resisted having sex with him. Although he did not expressly threaten the victim, she was afraid defendant would hurt her if she refused to have sexual intercourse with him. She thought defendant would hit her if she resisted. In her police interview, the victim said, "[L]ike if I -- like if I do try to resist him, he gets really upset and mad." "And I'm just afraid so I just don't really resist." When the detective asked her how she resisted, the victim responded, "I just say like I don't wanna do this and *then like I can tell that he gets angry. I just do whatever he say*s." Although the prosecutor did not ask the victim when this occurred, the victim did testify that once defendant was with Amber, she no longer resisted defendant when he wanted to have sex with her, and as the majority acknowledges, Amber moved in with defendant and the victim when the victim was 17.

At one point, defendant told the victim not to tell anyone because if she did, he would go to jail and he would kill her. The victim testified that defendant made this specific threat when she was "like, 17 or 18." But she also testified that defendant told

5

her not to tell anyone what he had been doing to her when she was "younger" and she always did what defendant told her to do. Given the direct examination questions on this point, "younger" meant younger than 17 or 18.**4**

Furthermore, in her police interview, the victim said that defendant told her never to say anything to anyone, because he could possibly get in trouble. The evidence shows that the victim knew defendant had been incarcerated. She told the detective she did not want defendant to go to jail. The detective did not ask the victim when defendant said

---

**4** Evidence that the defendant told the victim not to tell anybody can be found in the following testimony:

"[PROSECUTOR]: . . . So he threatened you if you told someone?

"[VICTIM]: Yes.

"[PROSECUTOR]: What did he say? What did he say would happen if you told anyone?

"[VICTIM]: If I told anyone -- he basically told me not to tell anyone, because he would go to jail. And if he went to jail, then he would kill me.

"[PROSECUTOR]: . . . And did you believe him?

"[VICTIM]: Somewhat, yes.

"[PROSECUTOR]: . . . How old were you when he told you that?

"[VICTIM]: I think, like, 17 or 18.

"[PROSECUTOR]: . . . Did he tell you anything like that when you were younger?

"[VICTIM]: No.

"[PROSECUTOR]: *Did he ever tell you not to tell anybody when you were younger?*

"[VICTIM]: *Yes.*

"[PROSECUTOR]: Yes. So did you always do what your dad told you to do?

"[VICTIM]: Yes." (Italics added.)

6

that to her, but the victim said that was a reason she "never said anything to anyone."[5]  A reasonable jury could infer that the victim's use of the word "never" in the context of the interview discussion connoted that this reason for not telling anyone was one that was longstanding.

The majority relies on *People v. Espinoza* (2002) 95 Cal.App.4th 1287 (*Espinoza*), for the proposition that the victim's fear alone is insufficient to establish duress; the defendant must do or say something to establish that fear.  I have no quarrel with that proposition, but *Espinoza* and this case are different.  In *Espinoza*, the defendant was convicted of forcible lewd acts on a child (Pen. Code, § 288, subd. (b)) and attempted forcible rape (*id.*, §§ 261, subd. (a)(2), 664), as well as four counts of lewd acts on a child (*id.*, § 288, subd. (a)) for earlier acts of molestation he perpetrated on his 12-year-old developmentally challenged daughter.  (*Espinoza*, *supra*, 95 Cal.App.4th at pp. 1291, 1292-1293.)  The *Espinoza* court described the molestation upon which the forcible lewd acts and attempted forcible rape charges were based as follows:  "The fifth and final molestation occurred in the early morning hours . . . .  On this occasion, he not only rubbed [the victim's] body but he also put his tongue in her mouth, licked her vagina and tried to put his penis in her vagina.  [The victim] could feel '[s]omething going in me.'

---

[5]  The interview questions and answers on this point were as follows:

"[DETECTIVE TATE]:  [H]as he ever . . . said anything what will happen [*sic*] if you tell anyone or anything like that?

"[THE VICTIM]:  He just said if I ever told anyone, that I'd, um, that he would possibly get in trouble.

"[DETECTIVE TATE]:  Mm-hm.

"[THE VICTIM]:  And that's why I never -- I just never said anything to anyone.

"[DETECTIVE TATE]:  Mm-hm.

"[THE VICTIM]:  'Cause I don't want my dad to get taken to jail or anything."

7

[The victim] 'moved' to prevent defendant's penis from going inside her." (*Espinoza*, *supra*, at p. 1293, fn. omitted.) The court said nothing else about how the defendant attempted the intercourse other than that the defendant did nothing to overcome the victim's movement and he "did not grab, restrain or corner" the victim as had happened in a case the *Espinoza* court distinguished, *People v. Schultz* (1992) 2 Cal.App.4th 999. (*Espinoza*, *supra*, at p. 1320 & fn. 8.) The victim in *Espinoza* testified she was afraid defendant would " 'come and do something' " if she reported the molests, so she did not report what had happened. (*Id.* at p. 1293.) The prosecution's theory was duress. (*Id.* at p. 1319.) The *Espinoza* court reasoned that the evidence did not establish an implied threat by defendant, because there was no evidence the victim's fear was the result of something the defendant did or said. (*Id.* at pp. 1320 & fn. 8, 1321.)

Here, defendant did something during the very first incident that implied force or danger given the other circumstances; he *physically got on top of the victim.* That did not happen in *Espinoza*, but as that court noted, " '[p]hysical control can create "duress" without constituting "force." ' " (*Espinoza*, *supra*, 95 Cal.App.4th at p. 1319.) When a biological father, whom a 12-year-old girl relies upon for support, comes into her bedroom while the two of them are the only people in the residence, takes off her clothes, and then *physically gets on top of her*, what is she to do? Where is she to go? What is she to think? I conclude that a reasonable jury could find the act of getting on top of the victim, in these circumstances, committed by a person the victim knew had been incarcerated, was sufficient to constitute an implied threat of force *or* danger. To be sure, our review is hampered by the failure of the prosecutor to elicit testimony concerning the defendant's height and weight and the victim's height and weight when the victim was 12 years old. Nevertheless, reversal on grounds of insufficiency of evidence is "unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence' " (*Bolin*, *supra*, 18 Cal.4th at p. 331), and we must presume the existence of every fact the jury could reasonably deduce from the evidence (*Kraft*,

8

*supra*, 23 Cal.4th at p. 1053). I conclude that there is substantial evidence in the record supporting the jury's finding of duress for the first sexual assault. Further, I conclude that the evidence supports the inference that the original duress carried over to subsequent acts.

Moreover, as outlined above, defendant did much more. Defendant's additional conduct includes: (1) telling the victim what he was doing was not wrong, but also telling her not to tell anyone; (2) telling the victim that he could possibly get in trouble if she told anyone what he had been doing; (3) throwing things and yelling at the victim when he was angry with her; (4) hitting her, but more when she was younger; (5) preventing the victim from having boyfriends, a tactic from which it may be inferred defendant sought to maintain his sexual dominance over the victim; (6) getting mad and slapping the victim when she violated his no-boyfriend rule; and (7) expressing or conveying anger when the victim resisted having sexual intercourse with him.

### III. Conclusion

Looking at the evidence in a light most favorable for the prosecution, keeping in mind that we must "presume[] in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence" (*Kraft*, *supra*, 23 Cal.4th at p. 1054), and reverse only when under "no hypothesis whatever is there substantial evidence to support [the conviction]" (*Bolin*, *supra*, 18 Cal.4th at p. 331), I respectfully disagree with the majority's conclusion that there was insufficient evidence to support defendant's convictions on all of the forcible sex crimes counts. I concur in all other respects.

                                                      MURRAY         , J.

9