Filed 1/27/14  P. v. Rosas CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B241854 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA091280) |
| v. | |
| JOSE ROSAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Tia Fisher, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann,  Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jose Rosas (appellant) appeals the judgment following a jury trial in which he was found guilty of committing five counts of a lewd or lascivious act upon a child under the age of 14 years (Pen. Code, § 288, subd. (a); counts 1, 3, 5, 7 & 8),[1] sexual intercourse by a person over 18 years of age with a child who is 10 years of age or younger (§ 288.7, subd. (a); count 2), a forcible lewd or lascivious act upon a child under the age of 14 years (Pen. Code, § 288, subd. (b)(1); count 4), and continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a); count 6).[2]

The trial court sentenced appellant to an aggregate determinate term of 30 years, as follows: for count 6, a determinate term of 16 years; for count 4 a consecutive determinate term of eight years; and for counts 1, 7 and 8 consecutive determinate terms of two years each (one-third the middle term of six years). It then imposed, for count 2, a fully consecutive term of 25 years to life. The terms for counts 3 and 5 were imposed concurrently. The total term in state prison was 55 years to life.

---

[1]     All further references are to the Penal Code unless otherwise indicated.

[2]     Count 1, a lewd act upon a child under the age of 14, was alleged to have occurred on or between September 19, 2004, and September 18, 2006. Count 2, sexual intercourse by a person over 18 years of age with a child 10 years or younger, was alleged to have occurred on or between September 20, 2006, and September 18, 2007. Count 3, a lewd act upon a child under the age of 14, was alleged to have occurred between September 20, 2006, and September 18, 2007. Count 4, a forcible lewd act upon a child under the age of 14, was alleged to have occurred on or between September 19, 2007, and December 29, 2009. Count 5, lewd act upon a child under the age of 14, was alleged to have occurred on or between September 19, 2007, and December 31, 2009. Count 6, continuous sexual abuse, was alleged to have occurred between January 1, 2010, and July 13, 2010. Counts 7 and 8, committing a lewd act upon a child under 14 years of age, were alleged to have occurred on or about July 14, 2010.

He contends that he is entitled to a reduction of his conviction in count 4 by striking the jury findings of duress and/or force and imposing the lesser term of punishment for a violation of section 288, subdivision (a), as the evidence is insufficient to show he accomplished this offense by force and/or duress.

## BACKGROUND

We view the evidence in the light most favorable to the verdict and resolve all conflicts in its favor. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Barnes* (1986) 42 Cal.3d 284, 303.)

1. *The prosecution case.*

Jane Doe (Jane) was born in September 1996.[3] Fourteen-year-old Jane testified that from age eight through 14 she lived with her mother R., her stepfather appellant, an older sister M., and her younger brother Abraham. They lived in the rear house on the same lot as her aunt's Azusa residence. Jane called appellant "dad," and he was the only father she had known; he had moved in with her mother when she was very young.

Jane testified that appellant had engaged her in continuous sexual abuse from the time she was eight years old until she was 13 years old, at which time she reported the abuse. Jane recalled that at about age eight or nine, appellant started showing a sexual interest in her. He began staring at her and rubbing her chest underneath her clothing. When Jane was nine or 10 years old, her mother took the children with her to Mexico. Appellant did not accompany them.

When Jane was age 10, they returned to Azusa. The family again took up residence with Jane's aunt, living in one room in the residence at the front of the property where her aunt lived. Immediately upon their return, appellant started having sexual intercourse with her on a daily basis. He digitally penetrated her

---

[3]    During the proceedings, the victim's true name was not revealed. She was referred to as "Jane Doe" throughout the trial. In this appeal, we also will refer to her as "Jane Doe," or "Jane."

vagina some six to 11 times. When she was 12 years old, he began orally copulating her as well. At trial, she claimed he never sodomized her. She said that the older she became, the more frequently he molested her.

Jane said that, primarily, appellant raped her at night in the kitchen when everyone in the household was asleep. On other occasions, he raped her in the family's bedroom when they were alone during the day. He would even call Jane in from play in order to rape her.

Jane was afraid to report the sexual abuse to her mother. Initially, she believed her mother would not believe her. She had concluded her mother loved appellant more than she loved Jane. Later, Jane was afraid to upset her mother as her mother had diabetes, and Jane believed her complaint might aggravate her mother's diabetes.

On July 14, 2010, when Jane was age 13, appellant raped her twice in the early morning. That evening, her mother questioned her about why she was looking so sad. Jane could not stand the abuse anymore and told her mother that appellant had raped her that morning. Jane's sister telephoned the police.

Jane indicated she had not wanted to engage in sexual activity with appellant. But he would wake her up at night and signal her he wanted her in the kitchen. If she did not get up or indicated, "No," he would tell her or wave at her, "Come." Or he would tap her foot, waking her up. She would "make a little lie that [she was] going to go drink water, but [she didn't]." If she refused to go, the next day he would be "mad" at her and would not assist her if she needed some help. Sometimes she did not go if she was tired. On other occasions, she would not go because she really did not "want this anymore."

Once she was in the kitchen, he would start touching her. Then he would tell her "to bend over" or "something like that." He had demonstrated for her the position in which he wanted her to kneel on the floor -- on her hands and knees. When she got into position, he would then pull her pants or panties down, take off his lower clothing and rape her. When he inserted his penis, it would hurt.

4

During sexual intercourse, he would lean on her back and put his hands on her shoulders. Then he would move back and forth until he ejaculated, and he would quickly remove his penis from her vagina. He apparently did not always use a condom.

If he abused her during the daytime, he would "make up a little lie" about requiring her to do a chore and have her enter the bedroom. He would close and lock the door and pull the curtains down. Then he would tell her to lie on the bed. The first time he raped her, he lay down where she was sleeping on the floor. He lay against her back and pulled her pants down and inserted his penis into her vagina. She could not recall whether he hugged her to him to achieve penetration. Later, when he had her enter the bedroom, he would have her kneel on the edge of the bed with her arms on the bed. He would put a hand on her shoulder.

At one point, Jane asked appellant to stop. He replied, "No." She asked him why he was doing to this to her, and he did not reply.

At trial, Jane claimed that when appellant put his penis in her vagina, she did not attempt to move away from him. However, at the preliminary hearing, she testified that on occasions, she would attempt to get away. Sometimes, she was able to crawl away from him. But many times, she was unable to do so as appellant held her in place by putting his hands on her shoulders.

Malinda Wheeler (Wheeler), a forensic nurse specialist, testified to Jane's post-complaint sexual assault examination. Jane told Wheeler that appellant had threatened her, " 'Don't tell anyone or I won't let you go out with your friends.' " Jane said that appellant had been sexually assaulting her since age eight, and it had been going on day and night. Jane told Wheeler that appellant had sodomized her in the past but denied digital penetration and oral copulation. Wheeler concluded that Jane had an abrasion on the opening to the vagina, which was consistent with sexual activity. She had a loss of hymenal tissue consistent with past trauma and an anal tear at the 12:00 o'clock position that was less than a week old.

5

On July 14, 2010, after Jane reported the abuse to her mother, appellant was arrested. After a *Miranda* waiver (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*)), he admitted to the transporting deputy that he had had sexual intercourse with Jane that day. He claimed he did not begin having sexual intercourse with Jane until she was 12 and a half years old, and he had had sexual intercourse with her about 30 times.

On July 15, 2010, Los Angeles County Deputy Sheriff Janet O'Bryan spoke to appellant. After another *Miranda* waiver, he claimed that he started having sex with Jane six months previously at age 12 at Jane's request. He admitted having sexual intercourse with Jane on the morning of July 14, 2010, and that he had previously orally copulated Jane. He said the sexual abuse was limited to some 30 incidents in the last six months. He agreed that his wife took the children to Mexico in 2006, and they were gone about a year, returning in August or September 2007.

2. *The Defense.*

Appellant, age 51, testified that he had orally copulated Jane on the morning of July 14, 2010, stopped, and shortly thereafter returned to the bedroom to have sexual intercourse with her. Otherwise, he had engaged in sexual intercourse with her on only three previous occasions in February and March of that year and only after Jane was 12 and a half years old. He claimed he had engaged in no further sexual or lewd acts with her. On the occasions of these acts, he never held her down, threatened her or told her she could not see her friends. He succumbed to having sexual relations with Jane as she had insisted he "tickle" her.

When he was arrested, he told the arresting deputy he had had sex with Jane only five times, but the deputy told him to say it had occurred more often. The deputy told him if he admitted more acts, the authorities would file fewer charges against him. So he admitted 30 acts of sexual misconduct, instead of the five sexual acts he had actually committed. During the subsequent interview with

6

Deputy O'Bryan, he simply repeated the false claim of 30 acts of sexual misconduct.

## DISCUSSION

1. *Sufficiency of the evidence.*

Recently, in *People v. Whisenhunt* (2008) 44 Cal.4th 174, the California Supreme Court summarized the well-established standard of review.

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . . [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]' [Citation.]" (*People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 200.)

" ' "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the

7

facts upon which a determination depends. [Citation.]". . . .' [Citation.]" (*People v. Barnes* (1986) 42 Cal.3d 284, 303-304, 306.)

The uncorroborated testimony of a single witness is sufficient to sustain a conviction unless it is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Indeed, " '[t]he testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions. [Citations.]' " (*In re Robert V.* (1982) 132 Cal.App.3d 815, 821.)

2. *Other relevant legal principles.*

In pertinent part, section 288 provides, as follows. "(a) Except as provided in subdivision (i), any person who willfully and lewdly commits any lewd or lascivious act, including any of the acts constituting other crimes provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony . . . [¶] (b)(1) Any person who commits an act described in subdivision (a*) by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person*, is guilty of a felony . . . ." (Italics added.)

In order to establish "force" within the meaning of section 288, subdivision (b), the People must show a defendant used physical force " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' [Citation.]" (*People v. Soto* (2011) 51 Cal.4th 229, 242 (*Soto*).)

Duress means " ' "a direct or implied threat of force, violence, danger, *hardship* or retribution sufficient to coerce *a reasonable person of ordinary susceptibilities* to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." ' [Citation.]" (*Soto, supra*, 51 Cal.4th at p. 246.)

8

"There is some overlap between what constitutes duress and what constitutes force.  This is because duress is often associated with the use of physical force, which may, but need not be present to have duress.  However, as we have pointed out, the terms cannot be treated synonymously.  An application of the previously stated rule of statutory construction dictates that we find that force, as used in the context of section 288, subdivision (b), refers only to physical force.  To extend the meaning of that word to cover psychological coercion would be tantamount to rendering the word 'duress' meaningless in that statute."  (*People v. Pitmon* (1985) 170 Cal.App.3d 38, 50, fn. 9, overruled on another point in *Soto, supra*, 51 Cal.4th at p. 248, fn. 12.)

The totality of the circumstances are to be considered in appraising the existence of duress.  (*Soto, supra,* 51 Cal.4th 229, 246, fn. 9.)  Such factors may include a notable disparity in the physical size and age between the defendant and the victim (*Pitmon, supra*, 170 Cal.App.3d at p. 51), physical control that does not amount to "force" (*People v. Senior* (1992) 3 Cal.App.4th 765, 775), and a long-standing relationship of trust or commission of the crime in an isolated location (*People v. Superior Court* (*Kneip*) (1990) 219 Cal.App.3d at pp. 238-239 (*Kneip*)).

"A threat to a child of adverse consequences . . . may constitute a threat of retribution and may be sufficient to establish duress, particularly if the child is young and the defendant is her parent."  (*People v. Cochran* (2002) 103 Cal.App.4th 8, 15, overruled on another point in *Soto*, *supra,* 51 Cal.4th at p. 248, fn. 12; see *Kneip, supra*, 219 Cal.App.3d at p. 238-239 [molestations took place in an isolated room out of the presence of other adults, and the boy was threatened with humiliation and shame if he did not cooperate]; *People v. Bergscheider* (1989) 211 Cal.App.3d 144, 154, overruled on another point in *People v. Griffin* (2004) 33 Cal.4th 1015, 1028  [threat of punishment and restriction held sufficient to convict defendant accused of sexual misconduct with 13-year-old stepdaughter].)

" 'Lack of consent is not an element of the offense prohibited by section 288, subdivision (b), and the victim's consent is not an affirmative defense to such a charge. The victim's consent or lack thereof is simply immaterial.' [Citation.]" (*Soto, supra*, 51 Cal.4th at p. 245.) " '[T]he victim's actual consent does not eliminate the fact that the defendant actually uses violence, compulsion or constraint in the commission of the lewd act, nor does the victim's consent diminish the defendant's culpability or immunize the defendant from suffering the penal consequences that arise from a forcible lewd act.' Likewise, with respect to implied coercion or duress, a 'child victim's actual consent does not eliminate the fact that the perpetrator utilizes duress in the commission of the lewd act, and does not reduce the perpetrator's culpability or eliminate the penal consequences that attach due to the perpetrator's conduct.' " (*Ibid*.)

Whether a defendant used "force" or "duress" are factual issues to be determined by the trier of fact. (*People v. Babcock* (1993) 14 Cal.App.4th 383, 388, citation omitted; *Kneip, supra*, 219 Cal.App.3d at p. 238.)[4]

3. *The analysis.*

Substantial evidence is found in this record to support the jury's findings of force and/or duress.

Jane testified to or made statements at the preliminary hearing and to the forensic nurse, Wheeler, that demonstrate force and duress. Appellant engaged in duress to get Jane to cooperate in the sexual activity by threatening not to let her play with her friends and by withholding assistance from her on the days following any refusal to get out of bed to join him in the kitchen. He used his

---

[4] The decision in *People v. Woffinden* was ordered reprinted for tracking pending review by the California Supreme Court at 31 Cal.App.4th 1664 and ordered depublished. (29 Cal.Rptr.2d 538; 871 P.2d 1133.) Review was later dismissed. (40 Cal.Rptr.2d 402; 892 P.2d 1145.)

authority as her father to order her into the kitchen in the dead of night and in from play so he could engage in forcible lewd acts with her.

Further, Jane testified that appellant in effect had ordered her into the kitchen at night when she did not wish to go by telling her to "Come" when she ignored his signal to get out of bed. If she tried to crawl away from him when he started having sexual intercourse with her, he held her in place with a hand or hands on her shoulders. On one occasion, she asked him to "stop." He refused and then did not reply when she asked why he was subjecting her to sexual abuse.

The above evidence demonstrates circumstances amounting to duress and that appellant used physical force substantially different from or substantially greater than necessary to accomplish the lewd acts.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

ALDRICH, J.

11